UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CHARLES ANDERSON MILLER,

        Plaintiff,

    v.

CALIFORNIA DEPARTMENT OF
CORRECTIONS AND REHABILITATION
(CDCR), et al.,

        Defendants.

Case No. 16-cv-02431-EMC

**ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

Docket Nos. 94, 109

## I.   INTRODUCTION

In this *pro se* prisoner's civil rights action, Charles Anderson Miller complains about medical care he received at the Correctional Treatment Facility - Soledad (CTF-Soledad). Defendants have filed a motion for summary judgment, which Mr. Miller has opposed. For the reasons discussed below, Defendants' motion for summary judgment will be granted with respect to the pain medication claim, granted for two Defendants with respect to the total knee replacement claim, denied for three Defendants with respect to the total knee replacement claim, and denied with respect to the state law claims.

## II.   BACKGROUND

The following facts are undisputed unless otherwise noted.

There are two main areas of dispute in this action. First, Mr. Miller contends that Dr. Bright and other Defendants were deliberately indifferent when, starting in June 2014, they denied a Request For Services for him to receive a total knee replacement (TKR).[1] Second, Mr. Miller

---

[1] In various documents in the record, the surgery is referred to by different names, e.g., total knee replacement, total joint replacement, and total knee arthroscopy. For sake of clarity, the surgery

contends that several Defendants were deliberately indifferent to his serious medical needs and acted with retaliatory intent when they tapered him off MS-Contin, a form of morphine, in mid-2015.

A.    Requests For Services

In the California prison system, a Request For Services (RFS) is a form used by doctors "to request medical services for an inmate that [are] not available at the prison, such as specialty consults, certain imaging studies, and certain medical or surgical procedures." Docket No. 95 at 1-2 (Hall Decl.).[2] A requesting physician prepares the RFS and submits it to someone higher in the medical bureaucracy at the prison, such as the chief physician and surgeon, for review. The reviewer signs the RFS to signal his approval, authorization, denial or deferral of the RFS. *See id.* at 2; *see, e.g.,* Def MSJ 281.[3] The reviewer then returns the RFS form to the utilization management registered nurse (UMRN). Some more involved procedures require further approval, e.g., from the chief physician advisor in Sacramento or regional utilization management advisors. *See id.*; *see also* Hall Depo., RT 50; Beregovskaya Depo., RT 22.

As the RFS makes its way through the prison medical bureaucracy, the UMRN enters the RFS on the InterQual system, obtains a tracking number from InterQual, writes the tracking number on the RFS, and sends it to the reviewer (e.g., the chief physician and surgeon). InterQual is "a computer-based management system that track[s] the RFS and [makes] an initial determination about whether the request [meets] certain medical criteria, as determined by guidelines programmed into the system." Docket No. 95 at 2.

If the reviewer approves the RFS, the UMRN forwards the RFS to the scheduler (to schedule the appointment) or to the next level reviewer (if further approval is required). Docket

---

will be referred to as a TKR throughout this order.

[2] This general information about RFSs is taken from the declaration of nurse Davina Hall, a Defendant in this action. Nurse Hall described how the system worked when she handled the RFS for Mr. Miller. No one has suggested that her description of the RFS process and the use of the InterQual system in this case differs from how those things normally worked.

[3] Throughout this order, the Court refers to "Def MSJ" with a page number. Those documents are found in Docket No. 97, which sequentially paginates most of Mr. Miller's medical records.

No. 95 at 2. If the reviewer denies the RFS, the UMRN forwards the denied RFS to the inmate's Primary Care Provider. Docket No. 95 at 2.

B.    Events Occurring Before Mr. Miller Arrived At CTF in June 2014

The events and omissions on which Mr. Miller's legal claims are based occurred in and after June 2014, while Mr. Miller was at CTF-Soledad. It is, however, necessary to reach further back in time to provide some background information about his medical needs.

Charles Miller was 60 years old when he arrived at CTF-Soledad from Corcoran in June 2014.

He had been in prison since about 2002 serving a sentence totaling 115 years to life in prison. Docket No. 118 at 2; AG1584 (Jan. 14, 2002 abstract of judgment).

Mr. Miller fell and hurt his knee at a non-prison hospital on March 31, 2009. Docket No. 118 at 2.

A CT scan of his right knee was done in May 2009. Docket No. 118 at 2; Def MSJ 25. Eventually, arthroscopic surgery of the right knee was recommended for Mr. Miller. He underwent a stress test and received a cardiology clearance on about July 28, 2011, because a doctor wanted a cardiology clearance before Mr. Miller underwent the surgery. Docket No. 118 at 4; Def MSJ 169-170.

The arthroscopic surgery was done on August 9, 2012. Docket No. 118 at 6. The surgical procedures performed included a partial meniscectomy; chondroplasty; removal of a significant portion of the pyrophosphate crystals; and a synovectomy. Def MSJ 190-92.

Mr. Miller states that Dr. Chandrasekaran informed him at a follow-up appointment on August 21, 2012 that he "would need to have a total knee replacement surgery in the foreseeable future." Docket No. 118 at 7. The doctor's progress note does not mention TKR, as Mr. Miller concedes. *Id.;* Def MSJ 203.

At another follow-up appointment on November 21, 2012, Dr. Chandrasekaran noted that Mr. Miller had had arthroscopic debridement "with basically good results" and that the "cold weather is aggravating his problem." Dr. Chandrasekaran recommended steroid injections in the future. He also wrote: "Ultimately, he will end up having knee replacement. Then you can refer

3

1   him to an orthopedic surgeon also for checking it." Def MSJ 213-14.

2        Much of the disagreement in this case concerns the severity of the arthritis in Mr. Miller's

3   knee. X-rays of Mr. Miller's right knee were done on December 28, 2012. The radiologist's

4   report stated the following: "IMPRESSION: *Minimal arthritic change* with considerable

5   chondrocalcinosis." Def MSJ 218 (emphasis added). Chondrocalcinosis "is a metabolic

6   abnormality causing crystal formations in joints, also known as 'pseudogout.'" Docket No. 96 at

7   11 n.7. Chondrocalcinosis is treated medically rather than surgically, according to Dr. Barnett. *Id.*

8        X-rays of Mr. Miller's right knee were done again on December 10, 2013. The

9   radiologist's report stated: "IMPRESSION: No acute osseous abnormality. *Moderate to severe*

10  *osteoarthritis*. Significant chondrocalcinosis suggesting CPPD arthropathy. Small effusion.

11  Osteopenia. " Def MSJ 238 (emphasis added).[4]

12       Mr. Miller had a consultation with Dr. Smith, an orthopedist, on February 28, 2014. Dr.

13  Smith found that Mr. Miller "has very painful range of motion of the knee and severe crepitus

14  with range of motion. He is confined to a wheelchair part time but can ambulate with pain." Def

15  MSJ 256. Dr. Smith mentioned that a December 2013 x-ray "confirm[ed] severe degenerative

16  arthritis as well as probable calcium pyrophosphate deposition disease. There is calcification in

17  the menisci." *Id.* Dr. Smith recommended that Mr. Miller "undergo a consultation for a total knee

18  replacement given the severity of arthritis in his right knee and the fact that he is nearly wheelchair

19  bound at this time. Therefore, I am recommending that and we will try and get him scheduled for

20

21  _____

    [4] X-rays were done in later years that seemed to show little change, and noted moderate arthritis of the knee.

22

23  X-rays were done on January 22, 2015 and compared to the December 10, 2013 x-rays. the radiologist's report for the January 22, 2015 x-rays stated: "IMPRESSION: *NO SIGNIFICANT CHANGE* OR ACUTE OSSEOUS ABNORMALITY. *MODERATE ARTHROSIS*.

24  CHONDROLCALCINOSIS SUGGESTING CPPD CRYSTAL DEPOSITION DISEASE." Def MSJ 322 (emphasis added; capitalization in source).

25  The radiologist's report for an x-ray done on April 30, 2015 found "[m]oderate

26  osteoarthritis of the right knee with associated Chondrocalcinosis. No effusion." Def MSJ 381.

27  The radiologist's report for x-rays done on May 6, 2015 found "[m]oderate medial compartment arthritis. Mild lateral compartment and patellofemoral joint arthritis.

28  Chondrocalcinosis is redemonstrated. No fracture or joint effusion. IMPRESSION: Right greater than left knee joint arthritis." Def MSJ 385.

1 the total knee replacement." *Id.*

2   Mr. Miller saw Dr. Moon, his primary care physician ("PCP") on March 19, 2014. Dr.

3 Moon said he would prepare an RFS to seek approval for Mr. Miller to be seen by an orthopedic

4 specialist. Docket No. 118 at 9.

5   On April 4, 2014, Mr. Miller went to Pacific Orthopedic Medical Group for an

6 appointment with Dr. Alade, an orthopedist, who examined him and ordered x-rays. Def MSJ

7 259-261. Dr. Alade's notes recount the patient's history, as provided by the patient, including that

8 the patient had received "medicines, surgical procedure and *steroid injections* to his knee." *Id.* at

9 259 (emphasis added). Dr. Alade wrote that Mr. Miller's medical history included "diabetes,

10 hypertension, cardiac problems . . . [H]e has also had some kidney stent and cardiac stent

11 placements." *Id.* Mr. Miller weighed 256 pounds and was 5 feet 7-1/2 inches tall. *Id.* Dr. Alade

12 noted that the x-rays showed "marked narrowing of the lateral compartment of the knee with

13 calcification of the medial and lateral meniscus, tibiofemoral interval space less than 2 mm

14 laterally and about 3 mm medially to involve the right knee." *Id.* at 260. Dr. Alade wrote:

> Since no response to conservative treatment of exercise, medications
> and arthroscopic surgery, *including injection,* authorization request
> to be submitted for a total knee arthroplasty. Prior to surgery,
> medical clearance due to heart problems and having had a stent, and
> other metabolic problems to include hypertension and diabetes.
> Baseline laboratory studies have been ordered to include CBC,
> coagulation studies, arthritic panel and a comprehensive metabolic
> panel. Patient to return back to examiner for surgery *when
> medically cleared* and authorization is obtained.

20 *Id.* at 260 (emphasis added). Dr. Alade's understanding that Mr. Miller had tried steroid

21 injections that were unsuccessful was wrong. Mr. Miller did not have his first steroid injection

22 until more than a year later, in September 2015. *See* Def MSJ 452.

23   Mr. Miller states that, on June 4, 2014, Dr. Moon told him the arthroplasty was being

24 approved by the medical authorization committee at Corcoran and he would be referred back to

25 Dr. Alade for scheduling and pre-op tests to be done. Dr. Moon filled out an RFS listing a

26 diagnosis of "severe arthritis" and requesting "total knee arthroplasty." Def MSJ 272. On June 9,

27 2014, Dr. Beregovskaya denied the RFS Dr. Moon had prepared because Dr. Moon had not

28 adequately explained or documented the need for the requested services. Def MSJ 282. The next

day, Dr. Beregovskaya replaced the denied RFS with a new RFS she drafted on behalf of Dr. Moon. Def MSJ 281. (This June 10 RFS is discussed in more detail in Section C, below.)

C.    The Transfer to CTF-Soledad

On June 9, 2014, Mr. Miller began his transfer from CSP-Corcoran to CTF-Soledad. While en route, early on the morning of June 10, 2014, Mr. Miller became light-headed, lost consciousness and was taken by ambulance to a hospital in Templeton, California. The medical records indicate he complained of chest pain. *See* Def MSJ 277, 280. After a few hours, he was released from the hospital and transported to a prison in San Luis Obispo. Def MSJ 277-278. On June 12, 2014, he was taken from that prison to CTF-Soledad. Docket No. 118 at 13.

D.    The Conflicting Results On the RFS

One of the key issues in this action concerns the conflicting decisions on a single RFS. That RFS was approved at Corcoran and denied at CTF-Soledad -- with both decisions occurring close in time.

1.    RFS Is Approved At Corcoran

As mentioned above, on June 10, 2014, Dr. Beregovskaya prepared a new RFS on behalf of Dr. Moon -- at a time when Mr. Miller was either on his way out or had left Corcoran. Def MSJ 281. Dr. Beregovskaya's RFS listed the "principle diagnosis" as "TJR" and the "requested service(s)" as "ortho." *Id.*

The RFS was approved on June 17, 2014, by Dr. Wang, the chief medical officer at Corcoran. Def MSJ 283; *see also* Docket No. 115, Ex. 13 at AG5732. The RFS form has the notation "met" at the upper right corner, apparently a reference to the InterQual criteria having been met. An InterQual Review Summary for the RFS states "criteria met" for TKR. Docket No. 115-2 at 39 (AG5733).

The UMRN at Corcoran then e-mailed the approved RFS to her counterpart at CTF-Soledad, i.e., nurse Davina Hall, at 2:45 p.m. on June 18, 2014, with this message: "Please forward approved RFS from Corcoran to your scheduler." Docket No. 127 at Exhibit O (AG4136). Nurse Hall sent a reply e-mail at 10:53 a.m. on June 19, 2014, stating: "Thanks, we are working on it." *Id.* Nurse Hall declares that she does not recall whether she read that e-mail

from Corcoran on June 18 or 19, and does not recall whether a copy of the RFS was attached to the e-mail. Docket No. 95 at 3.

### 2. RFS Is Denied At CTF-Soledad

Meanwhile, a copy of the RFS that Dr. Beregovskaya had prepared on June 10, 2014 (but which had not yet been approved by Dr. Wang at Corcoran) was sent to CTF-Soledad, the prison to which Mr. Miller was being transferred.

Nurse Davina Hall received the RFS on June 12 or 13, 2014 from the Receiving & Release staff at CTF-Soledad. Nurse Hall was the UMRN at CTF-Soledad, and one of her duties as the UMRN was to process RFSs. The RFS she received was signed by Dr. Beregovskaya, had no signature to indicate whether it had been approved or denied, and did not have an InterQual tracking number written on it. Docket No. 95 at 2 (Hall Decl.). Nurse Hall checked InterQual and saw that the RFS had already been input into the system and issued a tracking number, but that no decision had been made on the RFS. Docket No. 95 at 2. Nurse Hall wrote the InterQual tracking number on the RFS and forwarded it to Dr. Bright, the chief physician and surgeon at CTF-Soledad. At the time nurse Hall received the RFS, she was unaware that medical staff at Corcoran were still processing the same RFS. Docket No. 95 at 3.

Dr. Bright denied the RFS on June 18, 2014. The brief note on the RFS indicates that Dr. Bright denied the RFS because there was only "mild" disease, based on a December 28, 2012 x-ray. Def MSJ 285. Dr. Bright gave a fuller explanation at his deposition as to why a knee replacement was not approved:

> [T]he reason that I didn't approve it is that you don't have evidence, objective evidence, of severe disease, which is the first step in the criteria for having a total knee replacement. And so in reviewing that and the imaging that we had, we didn't have that, . . . so because of that, we wouldn't approve that. [¶] Also, you proved very functional. And, like I explained before, a total knee procedure is a large procedure with lots of risks and complications, especially for somebody who is obese and has other co-morbidities, such as yourself. We don't want to put you in a situation where the risk may outweigh the benefit. So that's the first step. [¶] And, again, I didn't say that you would never have it. People who have arthritis of the knee or any joint, as it advances, may need a total joint replacement. But that is a time -- continuum over time until it finally progresses to the point it's severe and affects their ability to

7

function well.  That's when we address it again.  [¶]  Those are the reasons why it was denied here.

Docket No. 128 (Bright Depo.) RT 108-09.  Dr. Bright had not treated or met Mr. Miller before he denied the RFS.  Likewise, there is no evidence that Dr. Wang had treated or met Mr. Miller before he granted the RFS at Corcoran.

Nurse Hall received the denied RFS from Dr. Bright on June 18 or 19, 2014.  Nurse Hall does not recall whether she responded to the Corcoran nurse's e-mail before or after she had received Dr. Bright's denial of the RFS.  Docket No. 95 at 3.  According to nurse Hall, when she responded to the Corcoran nurse's email, she "was simply informing" that nurse that nurse Hall "had received the RFS form (on June 12 or 13, 2014) and had already forwarded it to the doctor for a decision.  [Her] response was not a confirmation that [she] received [Corcoran's] approved RFS, or that [she] had submitted the approved RFS for scheduling."  Docket No. 95 at 3.  Nurse Hall also stated that, even if she had received the approved RFS from Corcoran, she would not have sent it for scheduling because there would have been  two conflicting forms -- the one approved at Corcoran and the one denied at CTF-Soledad by Dr. Bright.  Nurse Hall did not have the authority to unilaterally decide which RFS form she would process -- resolving the conflict would be a job for the doctors or reviewers.  Nurse Hall declares that, had she been aware of the conflicting forms, she would have brought them to the attention of Dr. Bright or another supervisor and awaited further instructions.  Docket No. 95 at 3.  Nurse Hall also declares that, because she was aware of only Dr. Bright's denial of the RFS, she forwarded the denied RFS to Mr. Miller's PCP, and had no further involvement.  *Id.*

Dr. Bright admits that someone on the utilization management staff informed him on June 18, 2014, that medical staff at Corcoran approved on June 17, 2014 a request for Mr. Miller to return to Dr. Alade for an ortho consult.  Docket No. 132, Ex. 4 (RFA No. 26).

E.     Mr. Miller's Care at CTF-Soledad

Mr. Miller saw Defendant Dr. Ahmed on June 16, 2014 "the best I recall" and Dr. Ahmed said he had already done an RFS for Mr. Miller to have TKR that had been approved at Corcoran but needed to be re-approved at CTF-Soledad.  That did not make sense to Mr. Miller because he had not even arrived at CTF-Soledad by June 10, 2014 for Dr. Ahmed to have acted as his PCP.

8

United States District Court
For the Northern District of California

Docket No. 118 at 13.

Mr. Miller saw Dr. Ahmed again on July 16, 2014. Docket No. 118 at 14. At this appointment, Mr. Miller learned that Dr. Bright had denied the TKR request but did not learn the reason for the denial. Dr. Ahmed's notes for this visit stated "Denial of RFS (ortho) . . . to discuss. RFS for ortho consult denied as x-ray (2012) showed mild" change in the chondrocalcinosis. Docket No. 116, Ex. 11 (AG507)

On October 2, 2014, Dr. Ahmed told Mr. Miller that Dr. Bright denied the RFS for a TKR. Docket No. 118 at 14-15. Mr. Miller states that Dr. Ahmed showed Mr. Miller on the computer screen a June 10, 2014 RFS that had Dr. Ahmed's handwriting and stamp, but this document later disappeared from Mr. Miller's medical records. Docket No. 118 at 14-15. Even Mr. Miller questions whether this RFS was correct as it would have been written before he even arrived at CTF-Soledad and Dr. Ahmed said there must have been some mistake on the date as to when the RFS was prepared and submitted. Docket No. 118 at 15; *see also id. at* 22. Dr. Ahmed continued to rely on the December 2012 x-ray to minimize Mr. Miller's condition while denying a TKR. *Id.* at 19.

Mr. Miller filed an inmate appeal (form CDC-602) complaining of the denial of the TKR. *See* Docket No. 131 at 37-75.

On January 7, 2015, Dr. Ahmed interviewed Mr. Miller for his inmate appeal. Mr. Miller tried to tell Dr. Ahmed that someone at Corcoran had approved the TKR, but Dr. Ahmed was disinterested. Dr. Ahmed said it did not matter what anyone other than he and Dr. Bright had ordered or approved, and that, from now on, it was what Dr. Bright and he wanted to do that mattered. Docket No. 118 at 22. Dr. Ahmed also stated that they had decided to provide a more conservative course of treatment than a TKR, consisting of long-acting morphine for pain and physical therapy. Docket No. 118 at 22. Dr. Ahmed was hostile during that visit, accusing Mr. Miller of being racist and making things up, and said he would write up a rule violation report if Mr. Miller continued "wasting [his] time with this nonsense." Docket No. 118 at 22-23. That comment made Mr. Miller stop challenging Dr. Ahmed further at that one interview. Dr. Ahmed said he would deny the inmate appeal, but would order another x-ray due to Mr. Miller's chronic

9

United States District Court
For the Northern District of California

1   pain, do an RFS for physical therapy evaluation, and would see Mr. Miller again when the x-ray

2   and physical therapy reports were in.  *Id.* at 23.  Dr. Ahmed signed the written first level response

3   that denied the inmate appeal on January 20, 2015.  That response stated, in part, that the RFS had

4   been denied by Dr. Bright "due to presence of mild disease on x-ray dated December 28, 2012 and

5   InterQual criteria were not met."  Docket No. 131 at 45.

6        Significantly, before the inmate appeal received a decision at the next level, there was a

7   newer x-ray report in Mr. Miller's file.  Specifically, the radiologist's report for the January 22,

8   2015 x-rays stated that there was "moderate arthrosis" and chondrocalcinosis.  *See* footnote 4,

9   *supra.*

10       On March 17, 2015, Defendant Dr. Posson, the chief medical executive at CTF-Soledad,

11  signed the second level response denying Mr. Miller's inmate appeal.  *Id.* at 51.  In response to

12  Mr. Miller's request for an explanation as to the reason for the denial of the TKR, Dr. Posson

13  wrote that Mr. Miller had not received the required approval for a TKR before he left Corcoran,

14  and that he had an episode of chest pain that required evaluation for a heart attack in the

15  emergency room during his transfer to CTF-Soledad.  Docket No. 131 at 49.  Dr. Posson also

16  wrote that the x-rays did not show evidence of severe disease; the latest x-rays showed moderate

17  (not severe) arthrosis on January 22, 2015; pain was being managed on long-acting morphine with

18  the help of physical therapy; Mr. Miller was able to function in his job; and Mr. Miller had refused

19  a pain control visit with his PCP on March 3, 2015.  *Id.*  Mr. Miller states that the missed

20  appointment was simply because the medication he wanted had already been ordered.

21  F.    Pain medication

22       Long-term use of opiates has "been found ineffective for chronic non cancer pain and thus

23  should not be prescribed, especially to patients at high risk of addiction."  Docket No. 96 at 13 &

24  n.8.  Extended release opiates such as MS Contin are particularly hazardous and prone to abuse.

25  *Id.*

26       At an appointment on April 7, 2015, Dr. Ahmed said he was renewing Mr. Miller's MS-

27  Contin (morphine) prescription.  Mr. Miller states that Dr. Ahmed did not mention any plan to

28  taper Mr. Miller off the morphine but did say he (Dr. Ahmed) had been asked to take the case to

United States District Court
For the Northern District of California

the pain management committee "to justify the use of morphine for more then [sic] five years pending the future TRK/TJR surgery if any." Docket No. 1-2 at 26.

The pain management committee recommended that Mr. Miller's morphine be tapered to elimination. A typewritten "Pain Management Note" from April 8, 2015, described Mr. Miller's case, noting that he was functioning well and was able to work in the kitchen pushing a broom and a cart without difficulty. The note further stated that Mr. Miller had "moderate OA [i.e., osteoarthritis] of the right knee with pseudogout and is functioning well. . . . Does not qualify for total knee. Total knees are indicated with advance arthritis that interferes with function. He does not meet criteria for narcotics. He has moderate disease and is fully functional." Def MSJ 344. The note appears to be signed by Dr. Bright.

Dr. Ahmed's morphine-tapering instructions were written on Mr. Miller's medication chart in a note dated April 8, 2015. Def MSJ 346. The instructions show that the morphine (which had until then been 30 mg. in the morning and 30 mg. in the evening) was to be tapered over 5 weeks until it was discontinued. *Id.*; *see also* Docket No. 96 at 13. During the weeks the morphine was being tapered, Mr. Miller was given aspirin and later an antihistamine, sulindac (a non-steroidal anti-inflammatory drug (NSAID)) and offered Tegretol for his pain and withdrawal symptoms. See Def MSJ 346, 361, 379, 382, 384, 389. He also was given ice for knee pain on April 30. Colchicin (a gout medication) was prescribed for Mr. Miller's CPPD. Def MSJ 382, 384.

Mr. Miller learned that Dr. Ahmed had ordered him to be tapered off the morphine on April 10 or 11, when he went to obtain his morphine and learned that his evening dosage has been reduced from 30 mg. to 15 mg. Thereafter, Mr. Miller filed numerous health care service request forms beginning on April 11, 2015 and through August 2015, complaining about knee pain and reiterating his demands for TKR. Docket No. 1-2 at 27; *see* Def MSJ 353-401. Mr. Miller was seen by Defendant nurse Roberto Deluna and other nurses in response to several of his health care services request forms.

Nurse Deluna saw Mr. Miller in response to Mr. Miller's first health care service request form dated April 12, 2015, that complained of severe pain due to the change in medication. Def MSJ 353. Mr. Miller wrote that he had "experienced greater right knee pain then [sic] before the

11

tapering had begun; as well as nausea, sweats, alternating chills, abdominal cramps, nasal drip/drainage, and explosive diarrhea-- in the form of addiction withdrawal symptoms" from the morphine. Docket No. 1-2 at 29 (Complaint, ¶ 78). Nurse Deluna saw Mr. Miller the next day, took Mr. Miller's vital signs; noted that he did not appear to be in acute distress and had eaten breakfast; and planned for Mr. Miller to continue the current plan and keep his April 21, 2015 appointment. Def MSJ 353. Mr. Miller states that nurse Deluna denied his request to see Dr. Ahmed immediately and told Mr. Miller, "'No, your [sic] going to have to just kick the morphine slowly, so deal with it.'" Docket No. 1-2 at 29. Dr. Ahmed had just written the directions for the morphine taper and, according to Dr. Barnett, nurse Deluna was obligated to follow medical orders written by supervising physicians. As Dr. Barnett also explains, the sentiment conveyed by nurse Deluna was accurate: detoxifying "from years of opiate use is difficult no matter how gradually the dosages are reduced." Docket No. 96 at 14.

Dr. Ahmed wrote a prescription for loratadine (an antihistamine) on April 21, 2015. Def MSJ 369.

Dr. Ahmed saw Mr. Miller on April 29, 2015, at which time Mr. Miller complained of knee pain. Dr. Ahmed planned to add naproxen and ordered an x-ray. Def MSJ 372-373 An x-ray done on April 30, 2015 revealed "moderate osteoarthritis of the right knee with associated chondrocalcinosis." Def MSJ 381.

Dr. Ahmed saw Mr. Miller again on May 5, 2015. Def MSJ 382. Dr. Ahmed ordered another knee x-ray and wrote that the patient agreed to try a medication, colchicin, for gout. Def MSJ 382-383. The medication was added to Mr. Miller's list of medications, which now included aspirin, an antihistamine and a gout medication, in addition to the reduced dosage of morphine.

Nurse Deluna processed Mr. Miller's May 11, 2015 health care services request form on May 14, 2015, and noted that the patient had an appointment to see his PCP that day. Def MSJ 386.

Mr. Miller saw Dr. Ahmed on May 14, 2015. Def. MSJ 387. Dr. Ahmed noted that there was "no bone on bone change," and moderate degenerative joint disease. *Id.* Dr. Ahmed planned to add Tegretol (also known as carbamazepine) to Mr. Miller's medications. *Id.* Mr. Miller told

Dr. Ahmed that he did not consent to take antidepressant, antiseizure/anticonvulsant, or antipsychotic/psychoactive drugs for off-label use to treat his knee pain because he had seen prison doctors do that for other inmates "turning them into virtual zombies; also reminding Dr. Ahmed about plaintiff's health care complication risk problems and a concern for adverse side-effects. Dr. Ahmed told plaintiff the carbamazepine would have no appreciable side effects (or at best minimal ones if it did) or present foreseeable complications." Docket No. 1-2 at 33. Dr. Ahmed incorrectly told Mr. Miller carbamazepine was not an anticonvulsant. *See id.* Carbamazepine also "is commonly used to treat pain," and "is approved for treatment of chronic pain by" the California Correctional Health Care System. Docket No. 96 at 14 & n. 11. Like other anti-epilepsy drugs, carbamazepine "is frequently prescribed as an alternative to opiate pain medications." Docket No. 96 at 16. Tegretol and Sulindac (an NSAID) were added to the list of medications Mr. Miller was prescribed. Def MSJ 389. The starting dose of Tegretol for Mr. Miller was 200 mg. each night, which was the minimal starting daily dose recommended by the manufacturer. Docket No. 96 at 15.

Mr. Miller took only one Tegretol pill and stopped. He asked for the prescription for Tegretol to be stopped and wrote that he had not given Dr. Ahmed informed consent to prescribe "any anticonvulsant, antiseizure, or antidepression medication for my RIGHT KNEE PAIN and told him not to do so before he did it leading me to believe this medication wasn't. After I took it, 5-15-2015, I experienced heart pulsations, light-headedness, dizziness and cramps, then learned its an ANTICONVULSANT!!!" Def MSJ 391. Although Mr. Miller attributes heart pulsations, light-headedness, dizziness and cramps to the single dose of Tegretol, he also had experienced those problems on many other days on which he was not taking Tegretol. *See, e.g.,* Def MSJ 316 (January 9, 2015 complaints of nausea, vomiting and dizziness); Def MSJ 323 (complaints of vomiting and diarrhea less than a week before a January 30, 2015 appointment). Mr. Miller also had a long history of complaints of chest pain; cardiac issues are mentioned throughout his medical records from as early as 2004 through 2016 -- including a trip to the hospital due to chest pains and passing out on June 10, 2014. *See, e.g.,* Def MSJ 4, 30, 119, 245, 246, 412, 500, 513, 593.

Nurse Deluna saw Mr. Miller on May 31, 2015 in response to his May 30, 2015 health care services request form complaining of knee pain. Nurse Deluna took Mr. Miller's vital signs, noted the condition of his knee, analyzed it as an "alteration in comfort" and "rt. knee pain," and planned for the patient to be put in the PCP line as scheduled for pain control evaluation. Def MSJ 401.

Nurse Deluna saw Mr. Miller on June 15, 2015 in response to his June 11, 2015 health care services request form in which he requested to see a pain specialist. Def MSJ 403. Nurse Deluna took his vital signs, and planned for him to see a PCP as scheduled. The next scheduled appointment date was July 10, 2015. Def MSJ 403.

In the ensuing months, various non-narcotics medications were prescribed for Mr. Miller's pain, including Tylenol and NSAIDs. *See, e.g.,* Def MSJ 425 (July 10, 2015 medication list includes acetaminophen, aspirin, sulindac (an NSAID), and two antihistamines); Def MSJ 452 (steroid injection to knee on September 2, 2015); Def MSJ 507 (February 8, 2016 medication list includes aspirin); Def MSJ 565 (April 13, 2016 medication list includes capsaicin cream, aspirin and Tylenol). Warm compression and exercise also were recommended for Mr. Miller. In March 2016, a rollator (i.e., a walker with wheels) was ordered for him. Def MSJ 539.

Mr. Miller filed an inmate appeal claiming that he had been deprived of pain medication in retaliation for his prior inmate appeal about the TKR. Docket No. 131 at 77. Dr. Posson signed the decision that denied the inmate appeal at the second level. *Id.* at 83.

Dr. Barnett opines that Mr. Miller was properly tapered off his morphine; that the doctors properly tapered Mr. Miller to minimize his withdrawal symptoms; that Dr. Ahmed prescribed appropriate pain medication to replace the morphine; and that nurse Deluna acted appropriately within the scope of his license to address Mr. Miller's pain and drug withdrawal symptoms. Docket No. 96 at 16.

At Dr. Bright's suggestion, Mr. Miller was referred to Defendant Dr. Williams, a physical medicine and rehabilitation specialist, for a consultation about his functioning and treatment related to his right knee pain. *See* Def MSJ 434-36. In his July 30, 2015 consultation report, Dr. Williams noted that Mr. Miller was severely obese with a body mass index of 41.2, had a significant medical history, including diabetes and hypertension; and the patient admitted he had

not been fully compliant with the exercise program taught by the physical therapist. *Id.* at 434-35. Dr. Williams noted that the medical records indicated that the patient was fully functional with a cane. *Id* at 435. Dr. Williams also noted that there were several x-rays, including an x-ray from April 2015 showing moderate osteoarthritis with associated chondrocalcinosis on the right knee. *Id.* at 435. Dr. Williams recommended physical therapy for core strengthening and to establish an exercise program for the knee and back. Dr. Williams determined that "the patient does not have a severe pain, meaning a degree of discomfort that significantly disables the patient from reasonable independent function and is overall modified independent with a cane." *Id.* at 436. Dr. Williams also stated that Mr. Miller "has not exhausted all conservative treatment options and surgery was not recommended. " *Id.* Dr. Williams recommended that Mr. Miller start physical therapy and be considered for knee steroid injections. *Id.*

### III.     VENUE AND JURISDICTION

Venue is proper in the Northern District of California because the events or omissions giving rise to the complaint occurred at a prison in Monterey County, which is located within the Northern District. *See* 28 U.S.C. §§ 84, 1391(b). The Court has federal question jurisdiction over this action brought under 42 U.S.C. § 1983. *See* 28 U.S.C. § 1331.

### IV.     LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is proper where the pleadings, discovery and affidavits show that there is "no genuine dispute as to any material fact and [that] the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A fact is material if it might affect the outcome of the lawsuit under governing law, and a dispute about such a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

In a typical summary judgment motion, a defendant moves for judgment against a plaintiff

**United States District Court**
For the Northern District of California

on the merits of his claim. In such a situation, the moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine dispute of material fact. The burden then shifts to the nonmoving party to "go beyond the pleadings, and by his own affidavits, or by the 'depositions, answers to interrogatories, or admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324.

A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence. *See Schroeder v. McDonald*, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746, plaintiff stated under penalty of perjury that contents were true and correct, and allegations were not based purely on his belief but on his personal knowledge). Mr. Miller's complaint is made under penalty of perjury, so the facts therein are considered in the adjudication of the summary judgment motion.

The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. *See T.W. Elec. Serv. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The evidence must be viewed in the light most favorable to the nonmoving party, and inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party. *See id*. at 631.

## V. DISCUSSION

A. Eighth Amendment Claims

Deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment's proscription against cruel and unusual punishment. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004). To establish an Eighth Amendment claim on a condition of confinement, such as medical care, a prisoner-plaintiff must show: (1) an objectively, sufficiently serious, deprivation, and (2) the official was, subjectively, deliberately indifferent to the inmate's health or safety. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994). These two requirements are known as the objective and subjective prongs of an Eighth Amendment deliberate indifference claim.

16

1.    Objective Prong

To satisfy the objective prong, there must be a deprivation of a "serious" medical need.  A serious medical need exists if the failure to treat an inmate's condition "could result in further significant injury" or the "'unnecessary and wanton infliction of pain.'" *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006).

The evidence in the record suffices to allow a jury to conclude that Mr. Miller's right knee problems presented a serious medical need.  The evidence shows that he had arthritis in his knee, pyrophosphate crystal depositions in his knees (also known as pseudogout), and longstanding complaints of knee pain.  On this record, a reasonable jury could conclude that his knee problems satisfied the Eighth Amendment's objective prong.

2.    Subjective Prong

For the subjective prong, there must be deliberate indifference.  A defendant is deliberately indifferent if he knows that an inmate faces a substantial risk of serious harm and disregards that risk by failing to take reasonable steps to abate it.  *Farmer*, 511 U.S. at 837.  The defendant must not only "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," but he "must also draw the inference."  *Id.*  Deliberate indifference may be demonstrated when prison officials deny, delay or intentionally interfere with medical treatment, or it may be inferred from the way in which prison officials provide medical care.  *See McGuckin v. Smith*, 974 F.2d 1050, 1062 (9th Cir. 1992) (finding that a delay of seven months in providing medical care during which a medical condition was left virtually untreated and plaintiff was forced to endure "unnecessary pain" sufficient to present colorable § 1983 claim), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (*en banc*).  There must be "harm caused by the indifference," although the harm does not need to be substantial.  *See Jett*, 439 F.3d at 1096.

Negligence does not amount to deliberate indifference and does not satisfy the subjective prong of an Eighth Amendment claim.  S*ee Wilhelm v. Rotman*, 680 F.3d 1113, 1122-23 (9th Cir. 2012) (finding no deliberate indifference but merely a "negligent misdiagnosis" by defendant-doctor who decided not to operate because he thought plaintiff was not suffering from a hernia).

A difference of opinion as to which medically acceptable course of treatment should be followed does not establish deliberate indifference. *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989) (summary judgment for defendants was properly granted because plaintiff's evidence that a doctor told him surgery was necessary to treat his recurring abscesses showed only a difference of opinion as to proper course of care where prison medical staff treated his recurring abscesses with medicines and hot packs). "[T]o prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk to [the prisoner's] health.'" *Toguchi*, 391 F.3d at 1058.

Prison officials cannot avoid Eighth Amendment liability by simply declaring that they disagree with a specialist's or treating doctor's prescribed course of care. The limits of the difference-of-opinion rule were illustrated in *Snow v. McDaniel*, 681 F.3d 978 (9th Cir. 2012), *overruled on other grounds by Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014), where the Ninth Circuit determined that the district court erred in granting summary judgment for defendants who argued that their refusal to approve double hip-replacement surgery for a prisoner who could barely walk due to hip pain showed a mere difference of opinion. In *Snow*, the prison medical committee repeatedly refused to authorize a double hip-replacement surgery, even though an orthopedic surgeon and the prisoner's treating physician considered the requested surgery to be an emergency. *See id.* at 986. Not only had the medical committee refused to authorize the surgery, the committee "gave no medical reason for the denials" and some evidence suggested the refusal was due to the warden's dislike of death row prisoners such as the plaintiff. *Id.* at 986-87. *Snow* rejected the defendants' argument that their choice to treat the prisoner with medications rather than surgery showed merely a difference of opinion that did not amount to an Eighth Amendment violation. *Id.* at 987-88. Although there was "clearly a difference of medical opinion," the evidence in the record and inferences therefrom could allow a reasonable jury to "conclude that the decision of the non-treating, non-specialist physicians to repeatedly deny the recommendations for surgery was medically unacceptable under all of the circumstances." *Id.* at 988. Significantly, the defendants sent the prisoner for evaluation by orthopedic surgeons, both of whom

18

recommended double hip-replacement surgery. *Id.* One of those surgeons testified at his deposition that the prisoner's likelihood of success after the surgery was very high, that surgery would help improve the prisoner's health and mobility, and that the surgery would allow the prisoner to avoid the use of the medications that were causing other health problems for the prisoner. On this record, "it should be for the jury to decide whether any option other than surgery was medically acceptable." *Id.* The court acknowledged that "a medication-only course of treatment may have been medically acceptable for a certain period of time," but saw the multi-year delay in approving the recommended surgery as presenting a triable issue as to medical acceptability of defendants' course of treatment under the circumstances. *Id.*

        a.    Total Knee Replacement (TKR)

Defendants Dr. Bright, Dr. Ahmed and nurse Hall are not entitled to summary judgment on Mr. Miller's claim that they were deliberately indifferent in response to his request for TKR surgery. Defendants Dr. Posson and Dr. Williams are, however, entitled to summary judgment on the claim.

        i.    Dr. Bright, Dr. Ahmed and Nurse Hall

Dr. Bright: There are triable issues as to whether Dr. Bright deliberately ignored more recent information in the medical file supporting a determination that a TKR was necessary and instead chose to rely on an outdated x-ray to deny the TKR. Dr. Bright specifically relied on a December 2012 x-ray which showed mild disease and testified that the primary reason he had denied the RFS was because Mr. Miller did not "have evidence, objective evidence, of severe disease, which is the first step in the criteria for having a total knee replacement." Bright Depo., RT 108-109. But the then-current information in Mr. Miller's medical record suggested he had severe arthritis when Dr. Bright denied the RFS on June 18, 2014. When Mr. Miller arrived at CTF-Soledad in June 2014, there was (1) an x-ray report from December 10, 2013, stating that Mr. Miller's right knee had "moderate to severe" arthritis, and (2) two orthopedists had recommended a TKR. Orthopedist Dr. Smith had recommended in February 2014 that Mr. Miller "undergo a consultation for a total knee replacement given the severity of arthritis in his right knee and the fact that he is nearly wheelchair bound at this time." Def MSJ 255. Dr. Smith noted in his

report that the x-rays from December 2013 "confirm *severe* degenerative arthritis." *Id.*

Orthopedist Dr. Alade had recommended in April 2014 that Mr. Miller be authorized to have a

TKR and be returned to him (Dr. Alade) for the surgery. A reasonable trier of fact could conclude

that Dr. Bright was deliberately indifferent to a serious medical need when he chose to rely on the

December 2012 x-ray that showed only "minimal arthritic change," DEF MSJ 218, when that x-

ray predated another x-ray showing more advanced arthritis and predated the recommendations

from two orthopedic specialists for Mr. Miller to have TKR.

There also is a triable issue as to whether Mr. Miller met the CDCR's objective criteria for

a TKR, a factor that informs whether Dr. Bright acted with deliberate indifference. The InterQual

computer program is used to make an initial determination about whether a patient meet certain

objective medical criteria for a requested service. At Corcoran, it was determined that the

InterQual criteria were met for a TKR. There is a genuine issue as to whether Dr. Bright ignored

objective medical criteria when he denied the RFS.

As mentioned earlier, orthopedist Dr. Alade had recommended in April 2014 that Mr.

Miller be authorized to have a TKR. Although Dr. Alade's recommendation had a flawed

assumption (i.e., that Mr. Miller unsuccessfully had tried steroid injections) and a precondition to

surgery (i.e., Mr. Miller had to receive a medical clearance), these do not show the absence of a

triable issue on the claim that Dr. Bright was deliberately indifferent in denying the TKR in June

2014. First, Dr. Alade's recommendation for TKR was based, in part on the mistaken belief that

Mr. Miller had exhausted conservative treatment options. Dr. Alade assumed that Mr. Miller had

tried steroid injections without success when in fact Mr. Miller had not had any steroid injections.

Dr. Bright did not mention that problem at the time he denied the RFS for a TKR, and a

reasonable trier of fact might conclude he did not rely on the absence of steroid injections to deny

the TKR. Second, Dr. Alade's recommendation for TKR was conditioned on Mr. Miller first

obtaining a medical clearance due to his heart and other medical problems. But Dr. Bright did not

mention the need for a medical clearance at the time he denied the RFS for a TKR, and a

reasonable trier of fact might conclude he did not rely on the absence of a medical clearance in

denying the TKR. Moreover, Defendants have not shown that a medical clearance is obtained

1  before a surgery is approved; it may be that, to avoid an unnecessary medical visit, a medical

2  clearance will not be sought until after a surgery is approved.

3      The limits in Dr. Alade's recommendation are important facts, but they appear to go to the

4  value of Mr. Miller's claim, rather than the existence of an Eighth Amendment violation. For

5  example, if Mr. Miller would not have been given a medical clearance due to his morbid obesity,[5]

6  diabetes, hypertension and other medical problems, then Dr. Bright's denial of the RFS arguably

7  did not cause much actual damage to Mr. Miller. And if steroid injections had to be tried before a

8  TKR would ever be permitted, then Dr. Bright's denial of the RFS might be viewed as having

9  caused little, if any, actual damage to Mr. Miller. Because Dr. Bright denied the RFS, Mr.

10  Miller's case did not progress to the point where the medical clearance was sought or to the point

11  where someone weighed the importance of trying steroid injections before sending him for a TKR.

12      Mr. Miller argues that Defendants mischaracterized the December 2012 x-ray as showing

13  only mild disease because the x-ray report actually stated that he had "minimal arthritic changes."

14  Whatever difference there may be between mild and minimal is not sufficient to create a genuine

15  issue of fact for trial. Insofar as Mr. Miller means that the additional statement in the December

16  2012 x-ray that there is "considerable chondrocalcinosis" meant that he did not have mild disease,

17  this argument fails because he has not shown that he has any medical expertise to opine about the

18  meaning of the finding of chondrocalcinosis on an x-ray. Nor does he present any admissible

19  evidence on this point. If this case ever goes to trial, he will need to hire a medical expert to

20  discuss chondrocalcinosis and the significance of it for the TKR decision-making.

21      Mr. Miller also argues the fact that the RFS had been approved at Corcoran before or

22  simultaneously with Dr. Bright's denial of the RFS at CTF-Soledad establishes his claim. If this

23  was all the evidence showed, Mr. Miller would have established nothing more than a difference of

24  opinion between Dr. Bright on one hand, and Corcoran doctors on the other hand. That difference

25

26  [5] Mr. Miller was 5 foot 7-1/2 inches tall. His weight bounced around, usually between 250 and 280 pounds in 2014-2016. *See, e.g.,* Def MSJ 287 (253 on June 12, 2014); 303 (270 on October 2, 2014); 311 (280 on December 30, 2014); 325 (270 on February 21, 2015); 342 (273 on April 7, 2015); 403 (264 on June 15, 2015); 442 (268 on August 6, 2015); 532 (254 on March 7, 2016). His weight was in the same range even before the TKR was under consideration. *See, e.g.,* Def MSJ 66 (274 on December 14, 2009); 117 (271 on June 10, 2010); 221 (270 on August 15, 2013).

27

28

of opinion would not in itself show an Eighth Amendment violation. "[T]o prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk to [the prisoner's] health.'" *Toguchi*, 391 F.3d at 1058.

On the other hand, Defendants are not entitled to summary judgment because the evidence supporting an inference that that Dr. Bright may have consciously disregarded the December 2013 x-ray and the two orthopedists' recommendations for a TKR takes this case beyond the typical difference-of-opinion case like *Toguchi* and moves it closer to *Snow v. McDaniel*. The existence of the x-ray showing moderate to severe arthritis and the existence of two orthopedists' recommendations for TKR – passed over for an earlier x-ray showing mild arthritis -- could permit a trier of fact to find that Dr. Bright's decision was made in conscious disregard of an excessive risk to Mr. Miller's health.

Dr. Ahmed: There are triable issues on Mr. Miller's claim that Dr. Ahmed was deliberately indifferent to Mr. Miller's need for the TKR. Viewing the evidence in the light most favorable to Mr. Miller, a reasonable trier of fact could conclude that Dr. Ahmed relied on the outdated December 2012 x-ray to deny the TKR and chose to ignore the two orthopedists' recommendations and the December 2013 x-ray. Dr. Ahmed apparently took the position that, once Dr. Bright denied the RFS on June 18, 2014, Dr. Ahmed was powerless to challenge the decision or to further pursue a TKR for Mr. Miller. But Dr. Ahmed has not come forth with undisputed evidence that, as a PCP, he was unconditionally bound forever by Dr. Bright's June 18, 2014 decision on the RFS.

Nurse Hall: Triable issues as to whether nurse Hall acted with deliberate indifference to Mr. Miller's serious medical needs preclude summary judgment for her. Nurse Hall received an email from a nurse at Corcoran on June 18 or 19 forwarding the RFS that had been approved at Corcoran. Although nurse Hall declares that she was without power to schedule the surgery because Dr. Bright had denied the RFS, she does not explain what became of the approved RFS. A reasonable trier of fact could conclude that she was aware of the approved RFS when she received the e-mail from the Corcoran UMRN that asked her to "forward approved RFS from

22

Corcoran" to the scheduler. At the summary judgment stage, this moving defendant is not entitled to a presumption that she handled the conflicting RFSs properly when she provides no evidence that she did so.  A reasonable trier of fact could conclude that she knew there was both a granted and a denied RFS.  And a reasonable trier of fact could conclude that, if a UMRN had conflicting RFS results (i.e., one granting and one denying the RFS), it would be deliberately indifferent to simply ignore the RFS that had been granted.

Defendants argue that nurse Hall had no authority to overrule Dr. Bright's decision.  That may be true but, by not bringing the conflicting RFSs to his attention, she preempted Dr. Bright from reconsidering the denial and changing his mind.  This situation is akin to the situation where a guard does not bring a patient to a medical care provider: the guard might not have any authority to provide medical care, but she can still be liable for refusing to bring the patient to someone who can provide medical care.

### ii.   Dr. Posson and Dr. Williams

Dr. Posson:  Viewing the evidence in the light most favorable to Mr. Miller, no reasonable jury could conclude that Dr. Posson was deliberately indifferent to Mr. Miller's serious medical needs.  Dr. Posson denied Mr. Miller's two inmate appeals at the second level.  As the Court explained in the order of service, there is no liability for merely denying or mishandling an inmate appeal.  *See* Docket No. 30 at 6.  Dr. Posson's potential Eighth Amendment liability, if any, would be based on his response to an ongoing medical need rather than on his failure to grant or properly handle an inmate appeal about an event that had already occurred.  Thus, the fact that he denied the inmate appeal about Dr. Bright's decision made months earlier does not in itself support liability for Dr. Posson.

Potential liability might exist if there was an ongoing need for a TKR at the time Dr. Posson made his decision.  Here, however, there was new information about Mr. Miller's condition when Dr. Posson addressed the inmate appeal.  By the time Dr. Posson considered Mr. Miller's first inmate appeal about the TKR, Mr. Miller had had further x-rays in January 2015 showing only moderate arthritis, rather than severe arthritis.  The two orthopedists' recommendations were still in the file, but they relied on earlier x-ray reports that showed severe

arthritis. Although the evidence in the record could allow a reasonable trier of fact to conclude that severe arthritis supports a TKR, there is no similar evidence that moderate arthritis supports a TKR. Since, at the time Dr. Posson considered Mr. Miller's case, Mr. Miller's then-current x-rays taken in 2015 showed only moderate arthritis, no competent evidence in the record would permit a reasonable trier of fact to conclude that Dr. Posson acted with deliberate indifference in not ordering a TKR in response to the inmate appeal. Dr. Posson is entitled to summary judgment on the TKR claim.

Dr. Williams: On the evidence in the record, no reasonable jury could find in favor of Mr. Miller's claim that Dr. Williams acted with deliberate indifference to his serious medical needs. It is undisputed that, at the time Dr. Williams saw Mr. Miller for a consultation, Dr. Williams knew: (1) Mr. Miller's then-current x-rays in 2015 showed only moderate arthritis; (2) Mr. Miller had never received steroid injections, contrary to the assumption of the orthopedist who recommended at TKR in April 2014; (3) Mr. Miller's records stated he was able to move about with the aid of a cane; (4) Mr. Miller had reported being less than fully compliant with physical therapy that had been given him in the past; and (5) Mr. Miller was morbidly obese and had hypertension and diabetes. Given this information that was known to Dr. Williams in 2015, no reasonable trier of fact could find that Dr. Williams was deliberately indifferent when he recommended that Mr. Miller try steroid injections, exercise and physical therapy to address his knee pain. Dr. Williams is entitled to summary judgment on the TKR claim.

At the time Dr. Williams evaluated Mr. Miller, circumstances were different from those present when Dr. Bright and Dr. Ahmed acted. When Dr. Bright and Dr. Ahmed denied the TKR in June 2014 and in the several months thereafter, the most current information in the file was the December 2013 x-ray showing moderate to severe osteoarthritis, as well as the recommendations by the two orthopedists for a TKR based on severe arthritis. In contrast, by the time Dr. Williams evaluated Mr. Miller in July 2015, there was a newer x-ray from January 2015 showing only moderate arthrosis. The orthopedists' recommendations had been made at a time when an x-ray showed a more severe condition, and there is no evidence in the record that the orthopedists would have recommended TKR if they had the January 2015 x-ray showing moderate arthrosis. The

deliberate indifference inquiry depends on the facts actually known to a defendant when he acts or fails to act, and the facts known to each defendant were not identical. By the time Dr. Williams (like Dr. Posson) did anything regarding Mr. Miller's TKR request, additional facts less favorable to a TKR were known that were not the same as those present when Dr. Bright and Dr. Ahmed had denied the TKR in 2014.

    b.  <u>The Morphine Taper</u>

  Having carefully reviewed the evidence, the Court concludes that no reasonable jury could find in Mr. Miller's favor on his Eighth Amendment claim against Dr. Bright, Dr. Posson, Dr. Ahmed, and nurse Deluna for their actions in tapering and eventually ending Mr. Miller's morphine prescription. It is undisputed that Mr. Miller was tapered from the morphine he had taken for several years, that the tapering took place over about five weeks, and that the morphine eventually was discontinued. Mr. Miller's evidence also suggests that many other inmates also were tapered from opiates as a result of prison-wide policies.

  Defendants have presented evidence that their decisions to wean Mr. Miller from morphine and to provide other medications were pursuant to the exercise of their medical judgment. The evidence shows that Mr. Miller was weaned from morphine gradually over a five-week period, during which time he was seen by nurse Deluna and other nurses repeatedly and by Dr. Ahmed on several occasions. He argues that nurse Deluna did not do anything for him, but the medical records plainly show the nurse was not wholly inert. Nurse Deluna took the patient's vital signs, observed that the patient being weaned from morphine was not in acute distress, and noted the patient's next appointment with his primary care provider. Nurse Deluna may not have done anything Mr. Miller wanted (such as a return to higher morphine levels), but that does not support a reasonable inference that nurse Deluna did nothing at all. Mr. Miller states that nurse Deluna denied his request to see Dr. Ahmed immediately and told Mr. Miller a few days into the tapering process that he would "have to just kick the morphine slowly, so deal with it.'" Docket No. 1-2 at 29. As Dr. Barnett notes, the sentiment conveyed by nurse Deluna was accurate: detoxifying "from years of opiate use is difficult no matter how gradually the dosages are reduced." Docket No. 96 at 14.

Several medications were provided to Mr. Miller to address his complaints during the morphine taper. And in the months after the morphine was discontinued, Mr. Miller continued to receive non-narcotic pain medications. Defendants also present Dr. Barnett's opinion testimony that the taper was properly done to minimize withdrawal symptoms, and that appropriate and adequate medications were prescribed to replace the morphine.[6]

Mr. Miller has no medical expertise and offers no competent evidence as to the proper use of morphine for chronic non-cancer pain, such as his knee pain. Mr. Miller is able to show that he wanted morphine, but does not offer competent evidence to controvert the defense evidence that morphine is ineffective for chronic non-cancer pain. Indeed, his repeated complaints of severe pain in the years before the taper even began support the view that the morphine was ineffective for his knee pain.

Tegretol was an anticonvulsant; Mr. Miller had categorically refused to take anticonvulsants. Mr. Miller took only a single pill before stopping the Tegretol. There must be "harm caused by the indifference" for an Eighth Amendment violation. *See Jett*, 439 F.3d at 1096. Mr. Miller has not provided evidence that would allow a reasonable jury to conclude that he was harmed by the single Tegretol pill he took. The symptoms he attributes to having experienced after taking a single Tegretol pill were symptoms he experienced on other days when he was not taking Tegretol, e.g., nausea, vomiting, heart problems, and dizziness. He only speculates that the single pill caused his symptoms that day. Not only does he not provide anything more than speculation that the single pill harmed him, he does not dispute Defendants' evidence that Tegretol is often used for pain relief.

Mr. Miller and the doctors sharply disagree as to whether his morphine should have been tapered and eventually discontinued. And Mr. Miller disagrees that the medications provided to

---

[6] Dr. Barnett stated in his declaration that: (a) "Dr. Ahmed (in association with decisions by Dr. Bright and Dr. Posson, supervisors for Dr. Ahmed) properly tapered Miller off his opioid pain medication (MS Contin);" (b) "Dr. Ahmed, Dr. Bright and Dr. Posson properly tapered Miller from opiates to minimize his withdrawal symptoms;" and (c) Dr. Ahmed prescribed appropriate and adequate pain medicine to replace the denied Morphine." Docket No. 96 at 16. Dr. Barnett further declared that "[t]he decision to discontinue chronic opiate therapy and Dr. Ahmed's choice of non-narcotic therapy (including carbamazepine) is within the community standard." *Id.* at 18.

him as his morphine was tapered were good enough to address his pain and withdrawal symptoms. Those disputes do not show a genuine dispute as to a material fact because the patient's personal preference does not set the Eighth Amendment standard. The difference of opinion between Mr. Miller and Defendants as to the proper course of care does not show deliberate indifference. Instead, Mr. Miller must show or raise a triable issue of fact that the course of treatment a doctor chose was medically unacceptable under the circumstances and that the doctor chose this in conscious disregard of an excessive risk to Mr. Miller's health. *See Toguchi*, 391 F.3d at 1058. Mr. Miller fails to make that showing.

Plaintiff did not submit evidence (other than his opinion) that the non-morphine medicines given to Plaintiff were medically insufficient to address his pain. The prescription of Tegretol did not amount to an Eighth Amendment violation. What exists here is the sort of differences of opinion about the best way to address pain that courts have repeatedly held either not to state a claim or not to create a triable issue on the deliberate indifference prong of an Eighth Amendment claim. *See, e.g., Shiira v. Hawaii*, No. 15-16338, slip op. at 1, 4 (9th Cir. Nov. 16, 2017) (affirming summary judgment for defendants who deprived plaintiff of methadone and Percodan but offered over-the-counter pain medication and treatment for potential detoxification symptoms; plaintiff's expert did not testify that offering alternative pain medications would be medically inappropriate); *Fausett v. LeBlanc*, 553 F. App'x 665 (9th Cir. 2014) (affirming summary judgment for defendants where doctors did not provide Valium ordered in hospital-discharge instructions after spinal-fusion surgery and instead provided substitute medicine and other pain medications); *Gauthier v. Stiles*, 402 F. App'x 203 (9th Cir. 2010) (affirming dismissal; plaintiff's disagreement with the dosage and type of pain medication administered after surgery not deliberate indifference); *Burton v. Downey*, 805 F.3d 776, 785 (7th Cir. 2015) (reversing denial of defense motion for summary judgment; jail health-care provider's decision to provide synthetic opioid rather to provide opioids or contact the doctor who prescribed the opioids before incarceration was not deliberate indifference); *Brauner v. Coody*, 793 F.3d 493, 497 (5th Cir. 2015) (although plaintiff stated that he required more pain relief than the over-the-counter and prescription medications provided by prison doctors for his undisputed bone infection with open

sores, "these are 'classic example[s] of a matter for medical judgment'" and, as a matter of law, do not amount to deliberate indifference); *Hill v. Curcione*, 657 F.3d 116, 123 (2d Cir. 2011) (district court properly dismissed claim that prison officials were deliberately indifferent in not prescribing medication stronger than Motrin for plaintiff's broken wrist because the medication decision was a matter of medical judgment); *Meuir v. Green Cnty. Jail Employees*, 487 F.3d 1115, 1119 (8th Cir. 2007) (summary judgment properly granted for defendants on inmate's claim that nurses were deliberately indifferent in prescribing Motrin but not medicated mouthwash for bleeding gums); *id.* at 119 ("In the face of medical records indicating that treatment was provided and physician affidavits indicating that the care provided was adequate, an inmate cannot create a question of fact by merely stating that she did not feel she received adequate treatment").

Defendants presented a declaration from Dr. Barnett, a doctor whose expertise included the management of knee injuries, painful knees and degenerative conditions of the knees, and had published writings on the treatment of chronic pain. *See* Docket No. 96 at 2. Dr. Barnett opined that Mr. Miller was properly tapered off his morphine; that the doctors properly tapered Mr. Miller to minimize his withdrawal symptoms; that Dr. Ahmed prescribed appropriate pain medication to replace the morphine; and that nurse Deluna acted appropriately within the scope of his license to address Mr. Miller's pain and drug withdrawal symptoms. Docket No. 96 at 16.

On the evidence in the record, no reasonable jury could find that Dr. Bright (as part of the management committee) was deliberately indifferent to Mr. Miller's serious medical needs when the committee determined that Mr. Miller did not meet the criteria for morphine and recommended discontinuation of the morphine for Mr. Miller. On the evidence in the record, no reasonable jury could find that Dr. Ahmed's decision to taper the morphine and his care for Mr. Miller during the tapering period amounted to deliberate indifference to Mr. Miller's serious medical needs. On the evidence in the record, no reasonable jury could find that nurse Deluna's responses to Mr. Miller's several health care service request forms during the morphine taper amounted to deliberate indifference to his serious medical needs. Finally, on the evidence in the record, no reasonable jury could find that the use of non-narcotic pain medications in the months after the morphine taper concluded amounted to deliberate indifference to Mr. Miller's serious medical needs.

Defendants are entitled to summary judgment in their favor Mr. Miller's claims pertaining to the pain medications and morphine taper.

B.    Retaliation Claim

"Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005) (footnote omitted). The provision of adequate medical care to inmates to maintain their health is a legitimate correctional goal.

Mr. Miller alleged in his complaint that the decision to taper the morphine and the tapering itself were done to retaliate against him for his inmate appeal that he first filed on December 10, 2014. Docket No. 1-2 at 48-50. He filed an inmate appeal and routinely threatened litigation or inmate appeals (CDC-602 form) if he did not get what he wanted in dealing with the medical staff. *See, e.g.,* Def MSJ 363 (4/21/15 doctor's note: "pt. extremely upset [about morphine taper] & threatened to take legal action."); *see also* Def MSJ 394, 427. And he frequently made references to his pending or upcoming litigation. *See, e.g.,* Def MSJ 402; Docket No. 131 at 77 (requesting names of pain management committee "for inclusion in lawsuit," and that he "be granted injunctive/declaratory relief by Court."). But Mr. Miller does not provide any competent evidence to dispute Defendants' evidence that the reduction and eventual elimination of the morphine reasonably advanced legitimate medical goals. *Cf. Barnett v. Centoni*, 31 F.3d 813, 816 (9th Cir. 1994) (summary judgment proper for defendants on claim of retaliatory reclassification when the reclassification was supported by "some evidence" and served a legitimate penological goal).

The undisputed evidence shows that Defendants were exercising reasonable medical judgment when they decided to decrease and eventually eliminate the dosage of morphine for the patient who had only chronic musculoskeletal pain. The undisputed evidence shows that opiates have been found ineffective for chronic non-cancer pain and that the pain management committee determined that Mr. Miller did not meet the criteria for narcotics. The undisputed evidence also

shows that the dosage of morphine was gradually decreased, other non-narcotic drugs were offered as morphine dosage got very low, and Mr. Miller was seen several times by nurses and Dr. Ahmed during the tapering process.

While the morphine taper did start after protected First Amendment activity, the evidence shows that the taper advanced a legitimate medical goal of ending morphine for a patient whose pain was not of the sort that warranted the use of morphine. Taking a prisoner off opiates that are not appropriate for his medical condition also advances the legitimate penological goal of reducing prescription drug abuse and drug addiction among the prison population. Given that the morphine taper reasonably advanced a legitimate medical goal that was also a "legitimate correctional goal," Mr. Miller is unable to establish one of the essential elements of a retaliation claim. *See Rhodes*, 408 F.3d at 567-68. Viewing the evidence and the reasonable inferences therefrom in the light most favorable to Mr. Miller, no reasonable jury could find in his favor on the retaliation claim with regard to the taper and discontinuation of the morphine. Defendants are entitled to judgment as a matter of law on the retaliation claim.

C.     Qualified Immunity

The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court set forth a two-pronged test to determine whether qualified immunity exists. First, the court asks: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Id.* at 201. If no constitutional right was violated if the facts were as alleged, the inquiry ends and defendants prevail. *See id.* If, however, "a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established. . . . 'The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.' . . . The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he

30

confronted." *Id.* at 201-02 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  Although *Saucier* required courts to address the questions in the particular sequence set out above, courts now have the discretion to decide which prong to address first, in light of the particular circumstances of each case.  *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

With regard to the TKR, the same triable issues of fact that preclude summary judgment for Defendants Dr. Bright, Dr. Ahmed and nurse Hall on the merits of Mr. Miller's Eighth Amendment claim also preclude summary judgment in their favor on the qualified immunity defense.  Taking the evidence in the light most favorable to Mr. Miller, it would be clear to a reasonable correctional medical care provider that an Eighth Amendment violation would occur by denying TKR to a patient who had severe knee arthritis on then-current x-rays for whom two orthopedic specialists had recommended TKR.  *See, e.g., Egberto v. Nevada Dep't of Corr*, 678 F. App'x 500, 505 (9th Cir. 2017) (district court erred in granting summary judgment for defendants based on qualified immunity because "a reasonable jury could conclude that Appellees delayed or denied recommended back-care treatment for non-medical reasons, including personal animus. It was clearly established during the relevant time period that such conduct would violate [the inmate's] Eighth Amendment right"); *Clement v. Gomez*, 298 F.3d 898, 906 (9th Cir. 2002) (summary judgment reversed on claim that prison officials were deliberately indifferent to medical needs following inmates' exposure to pepper spray because the law was clearly established that intentionally delaying care for serious medical needs violates Eighth Amendment); *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996) (summary judgment properly denied on qualified immunity defense to medical care providers who refused to provide a kidney transplant to an inmate; law was clearly established that Eighth Amendment was violated by deliberate indifference to medical needs).  It also would be clear to a reasonable nurse that an Eighth Amendment violation would occur by disregarding an RFS decision granting an important and needed medical procedure to an inmate.

For Dr. Posson and Dr. Williams, the evidence in the record does not establish a violation of Mr. Miller's constitutional rights in their responses to his request for TKR.  These Defendants prevail on the first prong of the *Saucier* analysis.  Even if a constitutional violation had been

shown, however, these Defendants would prevail on the second prong of the *Saucier* analysis. A reasonable medical staff member would not have understood that it would violate an inmate's constitutional rights to deny a TKR for the inmate whose then-current x-rays showed only moderate arthritis, who had not exhausted conservative treatment options, and who had significant other medical problems (i.e., morbid obesity, hypertension and diabetes) weighing against surgery. Dr. Posson and Dr. Williams are entitled to judgment as a matter of law on the qualified immunity defense for these claims.

With regard to the morphine taper and the retaliation claims, the evidence in the record does not establish a violation of Mr. Miller's constitutional rights. Defendants prevail on the first prong of the *Saucier* analysis. Even if a constitutional violation had been shown, however, defendants would prevail on the second prong of the *Saucier* analysis. With the undisputed evidence being that opiates are not effective for chronic non-cancer pain, and that the patient continued to complain of pain while on morphine, a reasonable medical staff member would not have understood that discontinuing the morphine through a gradual tapering and replacing it with accepted non-narcotic pain medications would violate the prisoner's Eighth Amendment rights or right to be free of retaliation. With regard to the Tegretol, the law was not clear it would be unconstitutional to prescribe to a patient complaining of opiate withdrawal symptoms a medication that was often used for aiding in opioid withdrawals merely because that medication also was primarily marketed as an anticonvulsant and the patient had expressed a desire not to take anticonvulsants. Defendants are entitled to judgment as a matter of law on the qualified immunity defense for these claims.

D.    <u>State Law Claims</u>

Defendants argue that Mr. Miller's state law claims should be rejected because he failed to comply with the California Tort Claims Act in that he did not adequately describe in his claim form some of the specific legal theories of relief he has included in his complaint. The state law claims in the complaint are for a violation of the Bane Act (California Civil Code Section 52.1), negligence, intentional infliction of mental distress, and breach of a doctor's fiduciary duty to his patient. Defendants' argument fails because they have not shown that a person's legal theories

1    must be alleged in the tort claim form to comply with the California Tort Claims Act.

2         The Tort Claims Act requires that the tort claim state the "date, place, and other

3    circumstances of the occurrence or transaction which gave rise to the claim asserted" and provide

4    "[a] general description of the . . . injury, damage or loss, insofar as it may be known at the time of

5    the presentation of the claim."  Cal. Gov't Code section 910(c) and (d).  As Defendants argue, the

6    "state law claims are subject to dismissal 'if [the complaint] alleges a factual basis for recovery

7    which is not fairly reflected in the written claim'" under the Tort Claims Act.  Docket No. 94 at 23

8    (quoting *Fall River Joint Unified School Dist. v. Superior Court*, 206 Cal.App.3d 431, 434 (Cal.

9    Ct. App. 1988)).

10        The factual basis for recovery alleged in Mr. Miller's complaint is fairly reflected in the

11   written tort claim.  Like his complaint, Mr. Miller's tort claim mentioned that defendants had

12   denied him a TKR, terminated the pain medication he had been receiving for several years, and

13   retaliated against him for his inmate appeals.  *See* Docket No. 97-2 at 203-04 (tort claim form).

14   The facts in the complaint are much more detailed, but the general factual bases for the wrongs

15   alleged are fairly reflected in the written tort claim.   The legal theories of recovery also are

16   mentioned in his written tort claim.  He wrote that his "type of case" was "State Civil Rights, MM,

17   IIED, statutes,"  -- which appears to be shorthand for a Bane Act claim (because that Act provides

18   a cause of action for interference with state and federal civil rights), medical malpractice; and

19   intentional infliction of emotional distress.  *See* Docket No. 97-2 at 203 (response to question 17).

20   His description of the injury included references to California Civil Code § 52.1 (i.e., the Bane

21   Act), California Government Code § 845.6 (i.e., a statutory negligence provision), federal

22   constitutional rights, emotional distress, and inadequate medical care.  Docket No. 97-2 at 204

23   (response to questions 19, 20 and 21).  Defendants have not established that Mr. Miller failed to

24   comply with the California Tort Claims Act presentation requirements.  *See Stockett v. Association*

25   *of Cal. Water Agencies Joint Powers Ins. Auth.*, 34 Cal. 4th 441, 447 (Cal. 2004) ("Only where

26   there has been a 'complete shift in allegations, usually involving an effort to premise civil liability

27   on acts or omissions committed at different times or by different persons than those described in

28   the claim,' have courts generally found the complaint barred.  . . . Where the complaint merely

1    elaborates or adds further detail to a claim, but is predicated on the same fundamental actions or

2    failures to act by the defendants, courts have generally found the claim fairly reflects the facts pled

3    in the complaint."); *see, e.g., id.* at 443 (plaintiff "is not barred from asserting additional wrongful

4    dismissal theories in his complaint where, as here, the notice of claim informs the public entity of

5    the employment termination cause of action giving rise to the claim and provides sufficient detail

6    for investigation by the public entity"); *Blair v. Superior Court*, 218 Cal. App. 3d 221, 223-24

7    (Cal. Ct. App. 1990) (tort claim form that stated that passenger was injured because State had

8    negligently constructed and maintained the highway surface, particularly by failing to sand it to

9    prevent icing, was sufficient to encompass a claim in complaint that the State had failed to provide

10    warning signs and a guardrail on the highway because negligent construction and maintenance

11    could reasonably be read to encompass all three theories of liability).  Defendants are not entitled

12    to summary judgment on the state law claims.

13    E.    <u>Mr. Miller's Motion To Exclude Dr. Barnett's Declaration</u>

14         Mr. Miller has moved to strike or exclude Dr. Barnett's declaration on the ground that Dr.

15    Barnett lacks sufficient expertise to testify about Mr. Miller's care.  Much of Mr. Miller's

16    argument is more of a disagreement with the substance of Dr. Barnett's statements rather than

17    showing that Dr. Barnett lacks the qualifications to render an expert opinion or make the

18    statements in his declaration.

19         Dr. Barnett's declaration and curriculum vitae show he is amply qualified to testify about

20    Mr. Miller's medical care, chronic pain and morphine tapers.  Dr. Barnett received his M.D. in

21    1975, currently is licensed to practice medicine in California, is board-certified in family

22    medicine, and has worked in correctional healthcare settings for about a decade.  Docket No. 96 at

23    1-2.  He is employed by the California Correctional Health Services as Chief Medical Consultant

24    for the Receiver's Office of Legal Affairs.  *Id.* at 1.  As Chief Medical Consultant, his duties

25    include reviewing medical records to monitor the quality of healthcare provided to California

26    inmates, instructing nurses and physicians regarding standards of care, and providing direct

27    medical care to inmates.  *Id.* at 2.  His expertise includes treatment of conditions that manifest in

28    the prison population, including the management of knee injuries, painful knees and degenerative

conditions of the knee. He has published writings on the standards of medical care applicable in prisons, and treatment of chronic pain. *Id.* He also is a member of the Opioid Workgroup Integrated Health Care and Policy Taskforce, a meeting of professionals sponsored by the California Department of Public Health to address prescription opioid misuse and abuse in California. *Id.*

Defendants offer Dr. Barnett's declaration to provide some medical opinions about the case and to give a coherent overview of the course of care. Dr. Barnett has adequate qualifications to provide the expert testimony about pain medication and the handling of the RFSs in this case. His medical training and years of practice also provide an adequate basis for him to interpret the medical records in this case. Reading medical records is something within the general knowledge of a practicing physician, regardless of board certification. Mr. Miller complains that Dr. Barnett lacks orthopedic expertise. But Dr. Barnett did not testify to anything requiring specialized orthopedic knowledge, e.g., he did not purport to offer an opinion about how to do a TKR or how to do an arthroscopic meniscectomy. Mr. Miller's motion to strike or exclude Dr. Barnett's declaration is DENIED. Docket No. 109.

F.    Miscellany

Mr. Miller's bloated presentation of his opposition greatly hindered the Court's analysis of the motion for summary judgment. The Court earlier cautioned Mr. Miller to be less longwinded in his presentations and directed him to comply with the page limits and the line-spacing limits in his filings. *See* Docket No. 30 at 11-12; Docket No. 104. Mr. Miller's motion to strike Dr. Barnett's declaration had nine pages of single-spaced text, in disregard to the Court's directions that his filings had to be double-spaced. Mr. Miller's opposition papers ignored the page limits. His opposition brief was 25 pages, but it was augmented by a 37-page declaration and a 36-page supplemental declaration that overflowed with legal arguments.

The Court reads hundreds or thousands of pages of filings each week. For this reason, strict compliance with page and line-spacing limits is mandatory for both represented and *pro se* litigants. Mr. Miller must in the future comply with the page and spacing limits set out in the order of service. Any declaration he submits must have only facts; any declaration he submits

**United States District Court**
For the Northern District of California

1  must not have argument about his views as to why Defendants should be held liable and must not

2  have statements made solely on information and belief. Legal arguments in a declaration will be

3  considered part of the legal brief for page-limit purposes. Failure to comply with any of these

4  requirements will result in the Court striking and disregarding the non-compliant documents.

5  G.  Referral To *Pro Se* Prisoner Mediation Program

6      The Court has granted summary judgment on some claims. There remains for adjudication

7  Mr. Miller's Eighth Amendment claim regarding the denial of the TKR and his state law claims.

8  This case appears a good candidate for the court's mediation program.

9      Good cause appearing therefor, this case is now referred to Magistrate Judge Robert Illman

10 for mediation or settlement proceedings pursuant to the *Pro Se* Prisoner Mediation Program. The

11 proceedings will take place within one hundred twenty days of the date this order is filed.

12 Magistrate Judge Illman will coordinate a time and date for mediation or settlement proceedings

13 with all interested parties and/or their representatives and, within five days after the conclusion of

14 the proceedings, file with the Court a report for the prisoner mediation or settlement proceedings.

15 **VI.  CONCLUSION**

16     For the foregoing reasons, Defendants' motion for summary judgment is **GRANTED IN**

17 **PART AND DENIED IN PART**. Docket No. 94. All Defendants are entitled to judgment in

18 their favor on the Eighth Amendment claim and retaliation claim regarding their discontinuation

19 of morphine and medication decisions, as well as on the defense of qualified immunity for those

20 claims. Dr. Posson and Dr. Williams are entitled to judgment in their favor on the Eighth

21 Amendment claim regarding the TKR, as well as on the defense of qualified immunity for those

22 claims. Defendants' motion for summary judgment is otherwise denied.

23     Mr. Miller's motion to strike and exclude Dr. Barnett's declaration is **DENIED**. Docket

24 No. 109.

25 ///

26 ///

27 ///

28 ///

This action is now referred to Magistrate Judge Illman for mediation or settlement proceedings pursuant to the *Pro Se* Prisoner Mediation Program. The Clerk will send a copy of this order to Magistrate Judge Illman.

**IT IS SO ORDERED**.

Dated: January 24, 2018

_____
EDWARD M. CHEN
United States District Judge